IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

RENE JACQUES,
Plaintiff,

v.                                                          Civil No. 3:20cv865 (DJN)

WIPRO LIMITED,
Defendant.

## MEMORANDUM OPINION

Plaintiff Rene Jacques ("Plaintiff") brings this action against Defendant Wipro Limited ("Defendant" or "Wipro"), alleging race and national origin discrimination and retaliatory discharge in violation of 42 U.S.C. § 1981. This matter now comes before the Court on the Motion to Dismiss or, Alternatively, Motion for Summary Judgment, and Motion to Strike Jury Demand (ECF No. 4) filed by Defendant.

For the following reasons, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion (ECF No. 4). Specifically, the Court DENIES Defendant's Motion as to Counts One, Two and Three of the Complaint (ECF No. 1). However, the Court GRANTS Defendant's Motion to Strike Jury Demand.

## I.      BACKGROUND

### A.      Factual Background

For the reasons set forth in the following sections, the Court declines to convert Defendant's Motion into a motion for summary judgment at this time, and will consider the Motion as a motion to dismiss. Therefore, at this stage, the Court must accept as true the facts set forth in the Complaint (ECF No. 1). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Against

that backdrop, the Court accepts the following facts as alleged for purposes of resolving Defendant's Motion.

Plaintiff, a black male of Haitian national origin, resides in Caroline County, Virginia. (Compl. ¶ 2.)  Defendant Wipro is a global information, consulting and outsourcing company that provides software development infrastructure management, business process outsourcing and consulting services to clients throughout the world.  (Compl. ¶ 3.)  In August 2017, Plaintiff graduated from the University of South Florida and subsequently entered into a contract of employment on December 12, 2017, to work for Defendant Wipro as a project engineer. (Compl. ¶¶ 4-5.)

Plaintiff's responsibilities at Wipro included supporting a team and providing engineering help on various projects.  (Compl. ¶ 5.)  On January 8, 2018, Wipro assigned Plaintiff to work at Capital One Corporation in Henrico County.  (Compl. ¶ 5.)  There, he worked on "Team Jackalope," a team of ten computer software engineers providing contracting work for Capital One and led by Paulose Poovathukaran, a Delivery Manager for Wipro.  (Compl. ¶ 6.)  Plaintiff represented the only black individual on the team — the other members were mainly of East Indian descent.  (Compl. ¶ 6.)  "Being a recent college graduate, [Plaintiff] had little information technology experience.  All of the other project engineers on Team Jackalope had between 2 and 10 years of experience."  (Compl. ¶ 8.)

Normally, Wipro would assign new project engineers a mentor during their first three months to guide these new hires and explain the general expectations of the company before requiring them to manage projects on their own.  (Compl. ¶ 9.)  However, Wipro did not assign a mentor to Plaintiff.  (Compl. ¶ 10.)  Plaintiff's team leader, Geethanjali Chinnasamy, did not consider herself Plaintiff's mentor and otherwise provided Plaintiff with no support in his first

2

months on the team.  (Compl. ¶ 10.)  According to Plaintiff, this lack of a mentor or other assistance placed him at a disadvantage.  (Compl. ¶ 11.)  For example, during his first several days on Team Jackalope, Plaintiff received a project well-beyond his skill level as a new hire.  (Compl. ¶ 11.)  Because of the lack of support, Defendant proved unable to complete the project, and Chinnasamy blamed him for this failure.  (Compl. ¶ 11.)

In addition to this lack of support, Chinnasamy also excluded Plaintiff from team activities, criticized Plaintiff when he took too long to complete projects and responded dismissively when he approached her with questions about his work.  (Compl. ¶ 12.)  Plaintiff was also "excluded from communications that directly impacted his job responsibilities" and "was not given the same access to database management systems as his co-workers."  (Compl. ¶ 13.)  For example, on one occasion, Chinnasamy excluded Plaintiff from an instructional email that she sent to other employees.  (Compl. ¶ 14.)  Without the instructions in the email, Plaintiff completed a project incorrectly and had to redo the work.  (Compl. ¶ 14.)  Plaintiff approached Delivery Manager Poovathukaran several times about his concerns, but Poovathukaran disregarded him.  (Compl. ¶ 17.)

Plaintiff claims that Chinnasamy and other managers "denied [Plaintiff] mentoring and training opportunities, and otherwise excluded him from work communications that would have aided in the performance of his tasks, on account of illicit bias against his black race and African descent, and his Haitian national origin."  (Compl. ¶ 16.)  However, despite these challenges, Plaintiff alleges that he otherwise "performed his duties well."  (Compl. ¶ 13.)

On August 30, 2018, Plaintiff received a new assignment.  (Compl. ¶ 18.)  However, before Plaintiff could begin this assignment, Chinnasamy called a meeting with Plaintiff and Poovathukaran and "complained that the tasks assigned to [Plaintiff] were minimal and that

3

[Plaintiff] should not be struggling to complete them." (Compl. ¶ 18.)  She also stated that

Plaintiff "was a hard worker but could not get up to speed," which Plaintiff "viewed as an insult

to his mental abilities." (Compl. ¶ 18.)  During this meeting, Plaintiff's supervisors made the

decision to remove him from Team Jackalope. (Compl. ¶ 18.)  Plaintiff made a final appeal to

keep his position on Team Jackalope on September 13, 2018. (Compl. ¶ 20.)  However, during

that final appeal, another Wipro supervisor told Plaintiff that he "was 'a good employee but not a

good fit.'" (Compl. ¶ 20.)

Wipro replaced Plaintiff with a white male, Joseph Kebler. (Compl. ¶ 21.)  Plaintiff

considered this discriminatory, because his replacement had not produced a deliverable in the

preceding two months. (Compl. ¶ 21.)  Additionally, during the two months following his

removal from Team Jackalope, Wipro's employees repeatedly asked Plaintiff to train and

instruct Kebler on the expectations of Plaintiff's former role. (Compl. ¶ 22.)

Between mid-September and late-November 2018, Plaintiff interviewed for a new role on

a different team at Capital One. (Compl. ¶ 23.)  However, Wipro told him that he did not qualify

for the position because of his unfamiliarity with various software, including database

management system Snowflake and interactive data visualization software Tableau. (Compl.

¶ 23.)  Nonetheless, "[a]t Wipro's urging," Capital One assigned Kebler to the position instead,

despite Kebler also having no knowledge of either of these systems. (Compl. ¶ 23.)

In October 2018, Plaintiff filed a complaint with Wipro manager Rajesh Krishnan

regarding his alleged mistreatment while working on Team Jackalope. (Compl. ¶ 24.)  Krishnan

promised to hold a meeting to resolve the issues, but never did. (Compl. ¶ 24.)

Plaintiff eventually entered a "free pool" of unassigned project engineers for several

months. (Compl. ¶ 25.)  While in the "free pool," Plaintiff looked for other opportunities within

Wipro, but believes he "was blocked from seeing the content of emails regarding his job search, leading him to believe that Wipro managers were impeding his job search." (Compl. ¶ 26.)

According to Plaintiff, in late-September or early-October 2019, Plaintiff lodged an official complaint with Wipro Ombudsperson Krishnan Kuamri, alleging that he had been subjected to discrimination because of his race and national origin. (Compl. ¶ 25.) Kuamri responded "dismissively," and "demanded proof that [Plaintiff] had lodged a discrimination complaint within 90 days [of] removal from Team Jackalope," which Plaintiff provided in the form of a screenshot of a December 2018 email to Krishnan that outlined his complaints. (Compl. ¶ 25.)

Wipro subsequently terminated Plaintiff on October 15, 2019. (Compl. ¶ 26.)

**B.     Plaintiff's Complaint**

On November 10, 2020, Plaintiff filed his Complaint against Defendants, raising three counts for relief based on the above allegations. In Count One, Plaintiff alleges that Defendant unlawfully discriminated against him on account of his race in violation of 42 U.S.C. § 1981. (Compl. ¶¶ 28-29.) In Count Two, Plaintiff alleges that Defendant unlawfully discriminated against him on account of his Haitian national origin, also in violation of 42 U.S.C. § 1981. (Compl. ¶¶ 30-31.) Finally, Count Three alleges a retaliatory discharge claim based on Plaintiff's discharge from employment after complaining of race and national origin discrimination, also in violation of 42 U.S.C. § 1981. (Compl. ¶¶ 32-33.)

Based on these claims, Plaintiff requests reinstatement and an award of compensatory damages in the amount of $500,000 for: (1) loss of past and future earnings, (2) loss of personal and professional reputation and esteem, (3) humiliation, pain and suffering and emotional distress, (4) punitive damages and (5) attorney's fees and costs of suit. (Compl. at 7.)

### C.    Defendant's Motion

In response to Plaintiff's Complaint, on December 8, 2020, Defendant filed a Motion to Dismiss or, Alternatively, Motion for Summary Judgment, and Motion to Strike Jury Demand (ECF No. 4), moving to dismiss Plaintiff's claims against it for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), or, alternatively, Rule 56.  In support of its Motion, Defendant argues that Plaintiff's claims fail as a matter of law, because Plaintiff did not allege facts sufficient to show that, but for his race or national origin, Defendant would not have taken the employment actions that it did.  (Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") (ECF No. 5) at 6.)  Defendant also argues that Plaintiff's retaliatory discharge claim fails, because Plaintiff cannot identify a causal connection between his allegedly protected activity and his termination.  (Def.'s Mem. at 11.)  Finally, Defendant contends that the Court should strike Plaintiff's jury demand, because the parties' written employment agreement contains clear, conspicuous language that waives both parties' right to a jury trial in the event of any legal action.  (Def.'s Mem. at 14.)

Plaintiff filed his Response in Opposition on December 22, 2020 (Pl.'s Resp. in Opp'n to Def. Wipro's Mot. to Dismiss ("Pl.'s Resp.") (ECF No. 7)), and Defendant filed its Reply on December 31, 2020, (Reply Mem. in Supp. of Mot. to Dismiss) ("Def.'s Reply") (ECF No. 10)), rendering Defendant's Motion now ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses.  *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a motion to dismiss, the Court will

6

accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

If materials "outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56[, and] [a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985) ("Because [the plaintiff] was not afforded an opportunity for reasonable discovery, the district court's treatment of the motion to dismiss as a motion for summary judgment was an abuse of discretion."). A

"reasonable opportunity" first requires that all parties receive some notice "that what is nominally a Rule 12(b)(6) motion to dismiss is subject to conversion to a summary judgment motion — for example, where the motion is captioned in the alternative as a motion for summary judgment and affidavits are attached to the motion." *Carter v. Baltimore Cty.*, 39 F. App'x 930, 933 (4th Cir. 2002) (citing *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998)). Additionally, once notified, the opposing party "must be afforded a 'reasonable opportunity for discovery' before a Rule 12(b)(6) motion may be converted and summary judgment granted." *Gay*, 761 F.2d at 177.

## III.   ANALYSIS

As an initial matter, the Court will address Defendant's request to convert its Motion to Dismiss into a motion for summary judgment. Specifically, Defendant makes this request, because Defendant asks the Court to consider three documents that it attaches to its Motion to Dismiss: (1) a copy of the Employment Agreement between Plaintiff and Defendant ("Employment Agreement" (ECF No. 5-1)); (2) a copy of the email that Defendant's HR team sent to Plaintiff notifying him of his termination ("Termination Email" (ECF No. 5-2)); and, (3) a copy of the 2019 ombudsperson complaint filed by Plaintiff, raising concerns over his removal from Team Jackalope ("2019 Complaint" (ECF No. 5-3)). The Court may consider the Employment Agreement as a document incorporated into Plaintiff's Complaint by reference at the motion to dismiss stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). However, consideration of the other two documents would require the Court to convert Defendant's Motion into a motion for summary judgment.

The Court declines to convert Defendant's Motion to Dismiss into a motion for summary judgment. While Plaintiff has received sufficient notice that Defendant's Motion is subject to

8

conversion, because of the captioning of the Motion, Plaintiff has not received a reasonable opportunity to conduct discovery. Importantly, in his response to Defendant's Motion, Plaintiff contends that discovery is necessary to resolve certain questions concerning his retaliatory discharge claim. (Pl.'s Resp. at 10.) Therefore, the Court will treat Defendant's Motion as a motion to dismiss and will only consider the allegations in Plaintiff's Complaint and the Employment Agreement attached to Defendant's Motion.

### A.    Counts One and Two:   Race and National Original Discrimination Claims

"Section 1981 'affords a federal remedy against discrimination in private employment on the basis of race.'" *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 440-41 (4th Cir. 2000) (quoting *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460 (1975)). In relevant part, § 1981(a) provides: "All persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." Further, this right includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

"The required elements of a prima facie case of employment discrimination are the same under Title VII and Section 1981." *Bryant v. Bell Atlantic Md., Inc.*, 288 F.3d 124, 133 n.7 (4th Cir. 2001) (citing *Gairola v. Commonwealth of Va. Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985)). These elements include: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and, (4) the occurrence of the adverse employment action under circumstances that give rise to an inference of unlawful discrimination. *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015) (citing *Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011)).

A plaintiff may establish the final element by showing that similarly-situated employees outside of his protected class were treated more favorably under similar circumstances. *Pettis v. Nottoway Cty. Sch. Bd.*, 980 F. Supp. 2d 717, 725 (E.D. Va. 2013) (citing *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

To survive a motion to dismiss, however, a plaintiff need not plead facts that would establish a prima facie case of racial discrimination. *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017). Rather, the plaintiff's allegations must "'raise [the plaintiff's] right to relief [under the *prima facie* framework] above the speculative level.'" *Coleman*, 626 F.3d at 190 (alterations added) (quoting *Twombly*, 550 U.S. at 555). In sum, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered a loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

First, Defendant does not dispute that Plaintiff constitutes a member of a protected class. (Def.'s Reply at 2.) However, Defendant challenges whether Plaintiff has plausibly alleged satisfactory job performance. (Def.'s Mem. at 7.) Specifically, Defendant contends that Plaintiff acknowledges numerous deficiencies in his own performance during his employment at Wipro that establish that he did not meet his employer's expectations, and that a supervisor's isolated comment after Plaintiff's removal from Team Jackalope that Plaintiff was "a good employee but not a good fit" does not change this fact. (Def.'s Mem. at 7.)

For a plaintiff to establish that he satisfactorily performed his work, he must allege "that at the time of his dismissal, he was performing his job in a way that met the legitimate expectations of [his employer]." *Pettis*, 980 F. Supp. 2d at 725. The Court will generally view an employer's expectations as "legitimate" unless they "were a 'sham designed to hide the employer's discriminatory purpose.'" *Warch v. Ohio Cas. Inc. Co.*, 435 F.3d 510, 518 (4th Cir.

10

2006) (quoting *Brummett v. Lee Enterprises, Inc.*, 284 F.3d 742, 745 (7th Cir. 2002)). An employer's expectations prove a mere "sham" when they constituted a pretextual policy for actual discrimination. *Brummett*, 284 F.3d at 745; *see also Laguerra v. U.S. Dep't of Treasury*, 2016 WL 3455373, at * 10 (D. Md. June 20, 2016) ("Furthermore, [the plaintiff] does not dispute the information and statistics provided by Defendants regarding her deficient performance, or that her work fell below her employer's stated expectations. Instead, she argues that [her employer] concocted those expectations as pretext for age discrimination. By overburdening and undertraining her, the [employer] ensured that [the plaintiff] would fail and that it would be able to rid itself of an older worker. This, at least, is [the plaintiff's] theory of pretext.").

According to Plaintiff's allegations — and making all reasonable inferences in his favor at this stage — the Court finds that Plaintiff has met his burden as to this element, because Plaintiff has plausibly alleged that Defendant's job expectations were a mere sham designed to hide the company's discriminatory purpose. While Plaintiff identifies several examples of work that he completed that fell below the expectations of his managers, these failures allegedly occurred because Defendant, through its employees who managed Plaintiff, continually held Plaintiff to standards not set for other employees and then penalized Plaintiff for failing to meet these invented standards. Specifically, Plaintiff claims that Wipro typically assigns every new employee a mentor during their first several months at the company to train them on job expectations. (Compl. ¶ 9.) However, Defendant did not assign a mentor to Defendant. (Compl. ¶ 10.) In fact, according to Plaintiff's allegations, he never received any guidance as a new hire, either from a mentor, his supervisor or any other employee at Wipro. (Compl. ¶¶ 10-12.) The

11

attitude of his team leader, Chinnasamy, proved so hostile during the early months of Plaintiff's employment that he felt insecure about asking her any questions. (Compl. ¶¶ 10-11.)

Additionally, Plaintiff never received access to the tools that he needed to complete his job. (Compl. ¶ 13.) Specifically, he could not access the same database management systems as his similarly-situated co-workers and did not receive the same instructional emails from his supervisors. (Compl. ¶¶ 13-14.) As such, Defendant left Plaintiff without "sufficient knowledge" to perform his job according to the expectations of his manager. (Compl. ¶ 11.) As stated, "Wipro managers held Jacques to the same standard as co-workers who were provided communication and afforded assistance that he was denied." (Compl. ¶ 13.) In sum, "Chinnasamy and other Wipro managers denied Jacques mentoring and training opportunities, and otherwise excluded him from work communications that would have aided in the performance of his tasks, on account of illicit bias against his black race and African descent, and his Haitian origin." (Compl. ¶ 16.)

Based on these allegations, Plaintiff has adequately alleged that the job expectations as Defendant imposed on him constituted mere pretext for Defendant's true discriminatory purpose. Defendant repeatedly set standards for Plaintiff that it did not set for any other employee. Even though Plaintiff alleges several instances when his job performance fell below the expectations of his supervisors, these instances occurred when Defendant had not given Plaintiff the tools, training or other resources to complete the task as it would other employees. At this stage, the Complaint plausibly alleges that these unreasonable and alternative expectations served as mere pretext for Wipro's bias. (Compl. ¶ 16.)

Moreover, Plaintiff alleges that another supervisor at Wipro told him that he "was 'a good employee but not a good fit,'" after Plaintiff made a final appeal to keep his position on

12

Team Jackalope. (Compl. ¶ 20.)  In *Tillery v. Piedmont Airlines, Inc.*, the Fourth Circuit found similarly positive feedback from a supervisor, given six weeks before the plaintiff's termination, sufficient to "cross[] the threshold to establish a prima facie case of age discrimination at this stage of the litigation." 713 F. App'x 181, 185 (4th Cir. 2017) (citing defendant employer who referred to plaintiff as "a seasoned and competent employee").  Defendant argues that the Court should distinguish *Tillery* from the instant case, because the supervisor here delivered the feedback two weeks *after* the decision to remove Plaintiff from Team Jackalope and a year before the termination of Plaintiff's employment, whereas the employer in *Tillery* conveyed the feedback six weeks before the plaintiff's dismissal. (Def.'s Reply at 4.)  As Defendant correctly notes, "'[t]he rationality, hence fairness, of [an] inference [of unlawful discrimination] obviously decreases as the time gap between last proven satisfactory performance and challenged employment action lengthens.'"  *Warch*, 435 F.3d at 516 (quoting *Lovelace v. Sherwin-Williams Co.*, 681 F.2d 230, 244 (4th Cir. 1982)).

However, the positive feedback here occurred in the context of a final appeal regarding the decision to remove Plaintiff from Team Jackalope. (Compl. ¶ 20.)  Therefore, the time gap between this affirmation of Plaintiff's satisfactory performance and his ultimate official termination from Team Jackalope proves brief.  Furthermore, because of this context, the supervisor clearly gave the feedback in connection with Plaintiff's performance as a member of Team Jackalope.  The Court finds Defendant's argument on this point unpersuasive, and concludes that Plaintiff has met his burden as to this element.

Finally, Defendant contends that Plaintiff has not met his burden as to the fourth element, because he has not shown that similarly situated employees outside Plaintiff's protected class received different treatment. (Def.'s Mem. at 9.)  The Court disagrees, and finds that Plaintiff's

13

identification of Kebler as a comparator satisfies Plaintiff's burden as to the fourth element at this stage.

While Plaintiff need not point to a comparator "as a matter of law" to succeed on his discrimination claim, if he bases his claim entirely on this comparison as Plaintiff does here, then the success of his prima facie case depends on whether the comparator is actually "similarly situated." *Bryant v. Aiken Regional Medical Ctrs. Inc.*, 33 F.3d 536, 545 (4th Cir. 2003); *Martinez v. Constellis, LLC*, 2020 WL 4589194, at *4 (E.D. Va. Aug. 10, 2020). To show that similar employees outside of his protected class received more favorable treatment under similar circumstances, Plaintiff must first "establish a plausible basis for believing [that the employees were] actually similarly situated." *Coleman*, 626 F.3d at 191. A showing of "similarly situated" requires that the comparator proves similar "in all relevant respects." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). This analysis includes "evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1982)).

In *Taylor v. Millennium Corp.*, the court found that the plaintiff's generalized allegations "that she shared the same job responsibilities and working conditions" as a co-worker sufficiently established an adequate comparator at the 12(b)(6) stage, noting that the similarly situated "question is better addressed at the summary judgment stage." 2016 WL 927185, at *7 (E.D. Va. Mar. 4, 2016). There, the plaintiff requested and was denied a job promotion, while the comparator received the promotion several months later despite the plaintiff being "more

14

qualified for the position . . . because she had more work experience." *Id.* at *1. The court found the fourth element adequately alleged based on these facts. *Id.* at *7.

Here, Plaintiff appears to base his § 1981 discrimination claims on his comparison to the other employees on Team Jackalope and his comparison to Joseph Kebler, the white man who replaced Plaintiff following his removal from Team Jackalope. However, the other employees on Team Jackalope do not prove so similarly-situated that they can serve as adequate comparators. Plaintiff makes it clear that these individuals *all* had between two and ten years of experience, whereas Plaintiff had less than a month of experience when he started on the team. (Compl. ¶ 8.) This difference in experience level represents such a differentiating circumstance that the Court has no basis to conclude that the differential treatment afforded to Plaintiff as a new hire and inexperienced employee at Wipro resulted from his race or national origin. While Plaintiff generally claims that he was treated differently than other "new project engineers," he offers no examples of similarly-situated individuals outside of his protected class for comparison.

Yet, Plaintiff's inclusion of Kebler as a comparator fares better. Plaintiff alleges that Defendant repeatedly afforded Kebler better opportunities despite lacking the experience and qualifications that Plaintiff had. Specifically, Plaintiff contends that Kebler took over his job despite having not produced any "deliverables" in the preceding two months. (Compl. ¶ 22.) Conversely, Defendant removed Plaintiff from this same team despite "perform[ing] his duties well." (Compl. ¶ 13.) Most importantly though, Plaintiff was rejected for a position on a different team after he "was told that he was ineligible for the team because he was not familiar with" a certain software program called Tableau. (Compl. ¶ 23.) According to Defendant, the position required knowledge of both Tableau and another database management system called

15

Snowflake. (Compl. ¶ 23.)  However, Kebler, "[a]t Wipro's urging," was assigned to the team "despite not knowing either Snowflake or Tableau." (Compl. ¶ 23.)  As in *Taylor*, Wipro passed Plaintiff over for a job opportunity while Kebler received it, despite Kebler being objectively less qualified for the position.  At this stage, the Court has no basis to conclude that other mitigating factors existed to explain the differential treatment and standards of employment afforded these two individuals.  Thus, given this allegation that Kebler received more favorable treatment despite being equally — if not less — qualified than Plaintiff, the Court can reasonably infer that this differential treatment resulted from racial or national origin discrimination.

While the allegations supporting Plaintiff's claim of discrimination appear sparse at this stage, the Supreme Court has cautioned against converting the prima facie elements "into a rigid pleading standard for discrimination cases." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  Indeed, at this stage, "Plaintiff need not establish a *prima facie* case, nor must [he] demonstrate that racial [or national origin] discrimination is the *only* plausible explanation for [his] termination.  It is sufficient that Plaintiff's Complaint states a plausible claim . . . based on the unexplained disparity in treatment between minorities and non-minorities . . . ." *Twyman v. Berry*, 2009 WL 10677269, at *4 (E.D. Va. Sept. 24, 2009).  For these reasons, Plaintiff has met his burden at this stage as to every element of his § 1981 claim.[1]  Therefore, the Court must dismiss Defendant's Motion as to Counts One and Two.

---

[1]     The Court finds it clear that Plaintiff has also met his burden as to the third element.  "An adverse employment action is a discriminatory act which 'adversely affect[s] the "terms, conditions, or benefits" of the plaintiff's employment.'" *James v. Booz-Allen & Hamilton*, 368 F.3d 371, 375 (4th Cir. 2004) (quoting *Von Guten v. Maryland*, 243 F.3d 858, 865 (4th Cir. 2001)).  A new job assignment that "is less appealing to the employee," without something more, does not qualify as an adverse employment action.  *Id.* at 376.  Indeed, "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone*

### B.      Count Three: Retaliatory Discharge Claim

The Court now turns to Plaintiff's retaliatory discharge claim.  "A plaintiff can prove

illegal retaliation under Title VII or § 1981 if he shows that '(1) [he] engaged in protected

activity, (2) he suffered an adverse employment action at the hands of [his employer]; and (3)

[the employer] took the adverse action because of the protected activity.'"  *Bryant*, 333 F.3d at

543 (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2000)).  Defendant

solely challenges whether Plaintiff has made the requisite showing as to the third element.

(Def.'s Mem. at 11-12.)  Specifically, Defendant contends that no plausible connection exists

between any complaint that Plaintiff filed regarding his termination from Team Jackalope and

his termination from the company.  (Def.'s Mem. at 12.)

Plaintiff acknowledges that he bases his retaliatory discharge claim on the filing of his

2019 Complaint with the Wipro Ombudsperson.  (Pl.'s Resp. at 10.)  Specifically, he bases his

claim on the fact that he "lodged a complaint with Wipro Ombudsperson Krishnan Kuamri that

he was being subjected to discrimination because of his race and national origin" in late-

September or early-October of 2019, and then "was terminated form employment with Wipro"

on October 15, 2019.  (Compl. ¶ 25.)

Based on these allegations alone, Plaintiff has met his burden, given the temporal

proximity between his protected action — lodging a complaint regarding his treatment in the

---

*v. Goldin*, 178 F.3d 253, 256-57 (4th Cir. 1999).  Defendant concedes in its Motion to Dismiss
that Plaintiff's "removal from Team Jackalope and his termination are legally adverse actions."
(Def.'s Mem. at 9.)  Yet, Defendant challenges Plaintiff's inclusion of other "adverse actions"
taken against him, including the fact that Plaintiff failed to receive a mentor, his supervisor
directed insults and sarcastic comments at him and the deprivation of various resources during
his employment.  (Def.'s Mem. at 8-9.)  However, the inclusion of these issues go to the
legitimacy of Plaintiff's employer's job expectations as already discussed — they do not
represent adverse actions that Defendant took against him.  The Court fails to see how
Defendant's arguments on this point prove relevant at this stage in defeating Plaintiff's claims.

workplace — and the adverse action taken by Defendant — his termination from Wipro.  To show a causal connection at this stage, Plaintiff may show that the adverse action came in close proximity to the protected activity engaged in by Plaintiff and that the protected activity preceded the adverse employment action.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (noting that cases "accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case"); *Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (stating that an employee's discharge "soon after the employee engages in protected activity is strongly suggestive of retaliatory motive and thus indirect proof of causation").  While the Fourth Circuit has not established a "bright temporal line" regarding the issue of "close proximity," it has noted that a three or four month period alone proves insufficient to establish a causal connection.  *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012).  However, a period of weeks may suffice.  *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003) (finding a period of two months and two weeks sufficiently short to give rise to an inference of causation to satisfy the prima facie requirement).

According to Plaintiff's allegations, Plaintiff filed a complaint against the company within mere weeks of his subsequent termination.  Specifically, he filed his complaint at the end of September or in early October, and his employment at Wipro ended in mid-October.  The Court finds this temporal proximity sufficient to establish a causal connection between Plaintiff's protected activity and his termination at this stage of litigation.[2]

---

[2]    The Court notes that Defendant attempts to defeat this claim by providing a copy of the 2019 Complaint that Plaintiff filed with Kuamri and the email that Plaintiff received from Defendant terminating his employment.  The 2019 Complaint lists the "Reported Date" as October 3, 2019, at 10:02 p.m. (2019 Complaint at 2.)  The Termination Email states that the email was sent on October 3, 2019, at 4:16 a.m. (Termination Email at 1.)  If these documents

C.    **Motion to Strike Jury Demand**

Finally, Defendant asks the Court to strike Plaintiff's jury demand, given that the

employment agreement between the parties conspicuously states that a judge will try any legal

action between the parties. (Def.'s Mem. at 13-14.) Plaintiff offers little argument or evidence

in response, merely stating that Plaintiff signed the document on his first day of employment,

"implying that it was presented to him by Wipro in the customary 'take it or leave it' fashion

typical of employment with a large, multi-national corporation." (Pl.'s Resp. at 10.) He adds

that the waiver "is buried near the end of an 11-page agreement, and [he] did not initial each

page." (Pl.'s Resp. at 10.) The Court finds that Plaintiff knowingly and voluntarily waived his

right to a jury trial when he signed the employment agreement.

While the Seventh Amendment provides a fundamental right to a jury trial, this right "can

be knowingly and intelligently waived by contract." *Leasing Serv. Corp. v. Crane*, 804 F.2d

828, 832 (4th Cir. 1986). The party seeking to enforce the waiver "must prove that consent [to

the waiver] was both voluntary and informed." *Id.* at 833. Factors that the Court will consider in

making this determination include: "(1) the parties' negotiations concerning the waiver

provision; (2) the conspicuousness of the provision in the contract; (3) the relative bargaining

power of the parties; and (4) whether the waiving party's counsel had an opportunity to review

---

prove authentic and the time stamps listed therein constitute an accurate representation of when
Plaintiff actually communicated his complaint to Kuamri, they would effectively defeat
Plaintiff's retaliatory discharge claim, because they demonstrate that Plaintiff did not file his
complaint until *after* he received notice of his termination. However, because the Court has
already declined to decide Defendant's Motion as one for summary judgment, and Plaintiff has
represented that discovery is necessary to determine the actual date that Plaintiff filed the 2019
Complaint — apparently suggesting that the time stamp on the document provided by Defendant
is *not* accurate — the Court will not resolve this Motion based on the information in these
documents.

the agreement." *Zaklit v. Global Linguist Sols., LLC*, 53 F. Supp. 3d 835, 855 (E.D. Va. 2014) (internal quotations omitted).

Applying these factors here, the Court finds that Plaintiff voluntarily and knowingly waived his right to a jury trial. First, Plaintiff alleges that he did not have the opportunity to negotiate the terms of the agreement. (Pl.'s Resp. at 10.) However, a lack of an opportunity to negotiate does not prove dispositive in negating a party's jury waiver. *See id.* (citing *Bryant Elec. Co., Inc. v. City of Fredericksburg,* 762 F.2d 1192, 1197 (4th Cir.1985) (upholding a forum selection clause in a contract entered into after competitive bidding process, where there was very little negotiation regarding its terms); *Torres v. SOH Distribution Co.,* 2010 WL 1959248, at *3 (E.D. Va. May 13, 2010) (stating, in a case brought by plaintiff-employee against defendant-employer, that "[a] mere lack of actual bargaining will not render a forum selection clause unenforceable.")). Moreover, in the paragraph preceding the jury waiver, the agreement expressly states: "You have the right to review this agreement with an attorney if you wish." (Employment Agreement at 8.) The inclusion of this provision weighs against a finding that Plaintiff did not have an opportunity to negotiate or at least consult with independent counsel before agreeing to the terms of the contract. *See Zaklit*, 53 F. Supp. 3d at 856 (finding that plaintiffs claim that they were "not permitted" to seek legal counsel before signing the contract was harmless error because the plaintiffs did not demonstrate that they lacked the expertise to understand the waiver and defendant had no duty to make sure plaintiffs were fully informed as to the waiver); *Gallo v. U.S. Investigation Servs.*, 2006 WL 1647194, at *2 (E.D. Va. June 8, 2006) (reasoning that waiver was knowing and voluntary when contained in agreement that had "a conspicuous warning admonishing Plaintiff to consult with an attorney prior to signing the Waiver").

Second, the jury waiver provision proves conspicuous.  The agreement between the

parties states that:  "Both parties agree that any legal action concerning the Employment or this

Agreement shall be tried by a Judge alone, and both parties hereby waive and forever renounce

the right to a trial before a civil jury."  (Employment Agreement at 8.)  This paragraph contains a

bold and capitalized header stating:  "**JURY WAIVER.**"  (Employment Agreement at 8.)  This

provision appears on page eight of eleven of the agreement.  (Employment Agreement at 8.)

Courts have found similarly formatted waivers sufficiently conspicuous.  In *Zaklit,* the

Court found that the plaintiffs had knowingly and voluntarily waived their jury trial right when

the waiver "[was] written in the same typeface and size as other provisions in the contract  . . .[,]

appear[ed] on page eight of twelve under the heading 'Governing Law' . . . [and was] written in

unambiguous and clear language."  53 F. Supp. 3d at 855.  The Court noted that although the

provision was not bolded or italicized, "the contract [was] short and [was] printed in easy-to read

typeface."  *Id.*  And in *Bank of America, N.A. v. Jill P. Mitchell Living Trust*, the court found a

jury waiver on the front side of an agreement, set off in a separate paragraph, printed in bold face

and on the seventh of ten pages sufficiently conspicuous, noting that the contract as a whole

"[was] far from voluminous."  822 F. Supp. 2d 505, 530-31 (D. Md. 2011).

Here, the jury waiver was (1) set off by a bold, capitalized heading that stated the

contents of the paragraph; (2) easily comprehensible and unambiguous; (3) not buried in fine

print; (4) on the face of the agreement; and (5) contained in a paragraph of its own.  Together,

these factors render the paragraph sufficiently conspicuous.

Third, the relative bargaining power of the parties does not prove so disparate that this

factor weighs in favor of Plaintiff.  Contrary to Plaintiff's suggestion, the mere fact that the

contract here is between an employee and a "large, multi-national corporation" does not render

21

the waiver involuntary. (Pl.'s Resp. at 10.) Indeed, many courts in the Fourth Circuit have

enforced jury waiver provisions in employment contracts between plaintiffs and corporate

defendants. *See Green v. Zachry Indus., Inc.*, 36 F. Supp. 3d 669, 676-77 (W.D. Va. 2014)

(finding that because the plaintiff "had the freedom to consider employment elsewhere, it cannot

be said that the plaintiff had 'little or no choice about the terms' of his employment

relationship"); *Taylor v. Republic Servs., Inc.*, 2013 WL 8808090, at *3 (E.D. Va. Apr. 16, 2013)

(finding that employment agreement "is not onesided, as it applies to both employer and

employee alike . . . [and] [t]here is not evidence before the Court that Plaintiff did not possess

sufficient education and experience to enter into the Agreement").

Here, Defendant presented Plaintiff, a college-educated individual, with a contract that

bound, benefitted and constrained both parties equally. Plaintiff chose to sign this agreement and

accept the conditions of employment in exchange for the benefits that he would receive as an

employee. Plaintiff has not stated or even implied that he did not have sufficient education,

experience or capacity to understand or enter into the employment contract. Moreover, Plaintiff

has not suggested that the agreement or bargaining process proved unconscionable in any way.

Indeed, Plaintiff's sole suggestion of unequal bargaining power relates to his claim that

Defendant presented him with the contract in a "take it or leave it" fashion. However, he

provides nothing to support his claim that this fact automatically rendered his jury waiver

involuntary, especially since both Defendant and Plaintiff represented equal parties to the waiver.

For these reasons, the Court GRANTS Defendant's Motion to Strike Jury Waiver.

## IV.   CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN

PART Defendant's Motion to Dismiss or, Alternatively, Motion for Summary Judgment, and

Motion to Strike Jury Demand (ECF No. 4).  Specifically, the Court DENIES Defendant's

Motion as to Counts One, Two and Three of the Complaint (ECF No. 1).  However, the Court

GRANTS Defendant's Motion to Strike Jury Demand.

Let the Clerk file a copy of this Order electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  April 6, 2021